## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SETH B. MARKS,<br>**Derivatively on behalf of the PUTNAM**<br>**RESEARCH FUND, the PUTNAM**<br>**OTC & EMERGING GROWTH FUND,**<br>**PUTNAM NEW OPPORTUNITIES FUND,**<br>**and the "PUTNAM FUNDS"**[1] | **CIVIL ACTION**<br>**NO.** |
| **Plaintiffs** | |
| v. | **03   12441   RWZ** |
| PUTNAM, LLC,  PUTNAM INVESTMENT<br>MANAGEMENT, LLC, MARSH &<br>MCLENNAN COMPANIES, INC.,<br>LAWRENCE J. LASSER, JOHN A. HILL,<br>JAMESON A. BAXTER, CHARLES B.<br>CURTIS, RONALD J. JACKSON, PAUL<br>L. JOSKOW, ELIZABETH T. KENNAN,<br>JOHN H. MULLIN, III, ROBERT E.<br>PATTERSON, W. THOMAS STEPHENS,<br>W. NICHOLAS THORNDIKE, GEORGE<br>PUTNAM, III, A.J.C. SMITH, CHARLES E.<br>PORTER, PATRICIA C. FLAHERTY,<br>JUSTIN M. SCOTT, OMID KAMSHAD,<br>JOHN DOES 1-50, AND JOHN DOES 51-100, | **MAGISTRATE JUDGE** Dein<br><br>**JURY TRIAL DEMANDED** |
| **Defendants** | |
| and | |
| PUTNAM RESEARCH FUND, PUTNAM<br>OTC & EMERGING GROWTH FUND,<br>PUTNAM NEW OPPORTUNITIES FUND,<br>PUTNAM FUNDS TRUST and the<br>"PUTNAM FUNDS" | |
| **Nominal Defendants** | |

## DERIVATIVE COMPLAINT

---

[1] A list of the "Putnam Funds" is attached to this Derivative Complaint as Exhibit A hereto.

The plaintiff, Seth B. Marks, derivatively on behalf of the Putnam Funds Trust, Putnam Research Fund, Putnam OTC & Emerging Growth Fund, Putnam New Opportunities Fund and the Putnam Funds hereby complains against the Defendants as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to Section 44 of the Investment Company Act of 1940 ("Investment Company Act"), 15 U.S.C. § 80a-43; Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa; and 28 U.S.C. § 1331.

2.      This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims asserted herein, because they arise out of and are part of the same case or controversy as the federal claims alleged.

3.      Venue is proper in this judicial district because some or all of the Defendants conduct business in this district and some of the wrongful acts alleged herein took place or originated in this district.

4.      In connection with the acts and practices alleged herein, Defendants directly or indirectly used the mails and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets and national securities exchanges.

## PARTIES

### Plaintiffs

5.      Plaintiff Seth B. Marks, a resident of University Heights, Ohio, purchased shares of the Putnam Research Fund, Putnam OTC & Emerging Growth Fund, Putnam New Opportunities Fund prior to December 1999 and continues to hold such shares.

**Putnam Defendants**

6.    Defendant Marsh & McLennan Companies, Inc., ("MMC"), a Delaware corporation, located at 1166 Avenue Of The Americas, New York, NY 10036, is the parent company of defendant Putnam, LLC, ("Putnam") and its affiliated companies. MMC is a global professional services firm with annual revenues exceeding $10 billion. MMC's wholly owned companies provide risk and insurance services, consulting, and, through its wholly owned subsidiary, Putnam Investments, Inc., investment management.

7.    Defendant Putnam describes itself as one of the largest mutual fund families in the United States with $271 billion in assets under management across multiple investment disciplines, over 100 mutual funds, nearly 13 million shareholder accounts, and over 2,200 institutional and 401(k) clients. Putnam offers a full range of both equity and fixed-income products, including mutual funds, variable annuities and alternative investments for institutions and high-net-worth investors, as well as investment advisory services for institutional portfolios, 401 (k)s, IRAs and other retirement plans. The majority of Putnam's assets under management are derived from U.S. individuals and institutions. Putnam is the parent company of Putnam Retail Management, Putnam Advisory Company, LLC (a wholly-owned subsidiary of The Putnam Advisory Company Trust) and Putnam Fiduciary Trust Company. Putnam, which generally conducts business under the name "Putnam Investments", is a wholly-owned subsidiary of Putnam Investments Trust, a Massachusetts business trust that, except for a minority stake owned by employees, is owned by MMC. The address of Putnam is One Post Office Square, Boston, MA 02109.

8.    Defendant Putnam Investment Management, LLC ("PIM" or the "Advisor"), formerly known as Putnam Investment Management, Inc., also located at One Post Office Square, Boston, MA 02109, is one of the largest equity managers in the United States, and

2

offers specialized services to investors, financial advisors, and variable annuity contract holders. PIM, a Delaware limited liability company, is owned by Putnam Investment Management Trust, a Massachusetts business trust, which in turn is owned by MMC. Through this organization structure, PIM is an indirect wholly-owned subsidiary of Putnam, LLC which is a wholly owned subsidiary of MMC. PIM is the Putnam Funds advisor and investment manager, responsible for making investment decisions for the fund and managing the fund's other affairs and business. The individual Putnam Funds pay PIM for management and investment advisory services quarterly based on the average net assets of the funds although the amount of the fees varies depending on the individual mutual fund or account and is usually based upon a sliding scale in relation to the level of assets under management and, in certain instances, is also based on investment performance.

9.      Defendant Lawrence J. Lasser ("Lasser"), located at 342 Warren St., Brookline, Ma 02445, is, and at all relevant times, was, President and Chief Executive Officer of both Putnam Investments and PIM, and in those capacities he is and was ultimately responsible for the actions of both Putnam Investments and PIM.

10.      Defendant Charles E. Porter ("Porter") is, and at relevant times was, Executive Vice President, Treasurer and Principal Financial Officer of both Putnam Investments and PIM, and in those capacities he is and was responsible for the day-to-day operations of both Putnam Investments and PIM, including its Legal, Compliance, and Corporate Affairs functions.

11.      Defendant Patricia C. Flaherty ("Flaherty") is, and at relevant times was, the Senior Vice President of both Putnam Investments and PIM, and in those capacities she is and was ultimately responsible for the actions of both Putnam Investments and PIM.

12.      Defendant Justin M. Scott ("Scott"), a resident of Marblehead, Massachusetts, was at all relevant times was managing director and chief investment officer ("CIO") of the

3

International Equities Group for Putnam, and in that capacity was responsible for investment decisions and oversight of the mutual funds supervised and organized under the Putnam International Equities Group.  On October 24, 2003, Scott was one of four portfolio managers terminated by Putnam as a result of his participation in the scheme alleged herein.

13.     Defendant Omid Kamshad ("Kamshad"), a resident of Weston, Massachusetts, was at all relevant times the managing director and CIO of the International Core Equity Group, and in that capacity was responsible for the investment decisions and oversight of the mutual funds supervised and organized under the Putnam International Core Equity Group.  On October 24, 2003, Kamshad was one of four portfolio managers terminated by Putnam as a result of his participation in the scheme alleged herein.  The Securities and Exchange Commission and the Commonwealth of Massachusetts have alleged that Kamshad's personal market timing in the funds he oversaw continued until March of 2003.

**Trustee Defendants**

14.     The Individual Defendants named are each Trustees of the "Trust" (see below). The address of each Trustee is One Post Office Square, Boston, MA 02109.

a.      John A. Hill, Chair
        Trustee since 1985 and Chairman since 2000

b.      Jameson A. Baxter
        Trustee since 1994

c.      Charles B. Curtis
        Trustee since 2001

d.      Ronald J. Jackson
        Trustee since 1996

e.      Paul L. Joskow
        Trustee since 1997

f.      Elizabeth T. Kennan
        Trustee since 1992

4

g.   John H. Mullin, III
     Trustee since 1997

h.   Robert E. Patterson
     Trustee since 1984

i.   W. Thomas Stephens
     Trustee since 1997

j.   W. Nicholas Thorndike
     Trustee since 1992

k.   Lawrence J. Lasser
     Trustee since 1992 and Vice President of the Trust, i.e., each of the
     Putnam funds, since 1981
     President and Chief Executive Officer of Putnam Investments and
     Putnam Management
     Director of Marsh & McLennan Companies, Inc., the parent
     company of Putnam, LLC and its affiliated companies

l.   George Putnam, III
     Trustee since 1984 and the President of the Trust, i.e., each of the
     Putnam funds, since 2000

m.   A.J.C. Smith
     Trustee since 1986 and Director of Marsh & McLennan
     Companies, Inc., the parent company of Putnam, LLC and its
     affiliated companies

The Trustees elect the officers of the Trust and have a fiduciary duty to the Trust and its

beneficiaries to maintain the safety of the assets of the Trust.

**John Does 1-50**

15.    The true identities, roles and capacities of John Does 1-50 have yet to be

ascertained (the "Putnam Fiduciary Defendants"). Included as Putnam Fiduciary Defendants are

insiders, i.e. employees and executives, of Putnam, PIM and the Putnam Funds including, but not

limited to, fund managers, advisors, brokers and sales executives who, because of their

relationship to the Putnam Funds had a fiduciary duty to the Putnam Funds, and breached such

fiduciary duty through their participation and facilitation of the market timing scheme alleged herein.

**John Does 51-100**

16.    The true identities, roles and capacities of John Does 51-100 have yet to be ascertained. Included in John Does 51-100 are hedge funds, hedge fund managers, brokerage firms and fiduciaries to the Putnam Mutual Funds who participated, exploited and perpetrated the unlawful late trading in Putnam Mutual Funds and knowingly violated the policies established by the Putnam Mutual Funds. In addition, it includes those entities and individuals who conspired and assisted in exploiting the opportunities provided by the Putnam defendants to make illicit trades in the Putnam Mutual Funds. Such defendants directly or indirectly profited by their own, or others, ability to engage in improper late trading and timing at the expense of non-participating Putnam Mutual Funds investors. Furthermore, John Does 51-100 actively enticed the Putnam Defendants to breach the fiduciary duties owed to the Putnam Mutual Funds through numerous means including the deposit of assets in other Putnam financial vehicles in exchange for the right to make short-term and late trades in Putnam Mutual Funds. The identities of John Does 51-100 will be disclosed in amendments to this complaint when the true identities are discovered.

**Nominal Defendants**

17.    Nominal Defendant Putnam Funds Trust (the "Trust"), a Massachusetts business trust organized on January 22, 1996, with its principal place of business located at One Post Office Square, Boston, MA 02109. The Trust is registered under the Investment Company Act as an open-end management investment company.

18.    Nominal Defendants Putnam Research Fund, Putnam OTC & Emerging Growth Fund, Putnam New Opportunities Fund (the "Funds") are mutual funds with assets held by the Trust with PIM as its Advisor. The Putnam Research Fund Putnam Research Fund seeks capital appreciation by investing primarily in common stocks recommended by members of Putnam's Global Equity Research Team. The portfolio typically invests in large U.S.-based companies believed to offer strong growth potential and may contain both growth and value stocks. The Putnam OTC & Emerging Growth Fund seeks capital appreciation by normally investing at least 65% of assets in stocks issued by companies that are in early stages of development and have records of profitability but may invest up to 20% of assets in foreign securities. The Putnam New Opportunities Fund focuses on growth stocks in order to seek long-term capital appreciation and normally invests in common stocks of U.S. companies, regardless of capitalization. The Funds are managed by PIM.

19.    The defendants described in paragraphs 6-13 and 15 are sometimes referred to as the "Putnam Defendants." The defendants described in paragraphs 17-18 are sometimes referred to as the Nominal Defendants. The defendants described in paragraph 14 are sometimes referred to as the "Trustee Defendants." The defendants described in paragraph 13 are sometimes referred to as the "Putnam Fiduciary Defendants."

## PRELIMINARY STATEMENT

20.    This derivative action is brought to recover damages for injuries to the Putnam Research Fund, Putnam OTC & Emerging Growth Fund, Putnam New Opportunities Fund, the Putnam Funds Trust and the Putnam Funds and each of them caused by the Defendants' breaches of fiduciary duty and unlawful and manipulative trading activities and devices in the Putnam Funds which operated as a fraud and deceit on the Plaintiffs and the Nominal Defendants (hereafter together "Plaintiff").

**Fiduciary Duty**

21.    Each of the Putnam Defendants and the Trustee Defendants owed to the Putnam

Funds and their shareholders the fiduciary duties of loyalty, candor and fair dealing, and under

the Investment Company Act, the duty to refrain from charging or collecting excess

compensation or other payments for services in order to preserve the funds' property and assets,

owed the duty not to place their own financial interests above those of the Putnam Funds and

their shareholders, and owed the duty of full and candid disclosure of all material facts thereto.

All Putnam Funds are held and governed by the Trust.

**Manipulative Devices**

22.    Like all other mutual funds, Putnam Funds shares are valued once a day, at 4:00

p.m. Eastern Time, following the close of the financial markets in New York.  The price, known

as the Net Asset Value ("NAV"), reflects the closing prices of the securities that comprise a

particular fund's portfolio plus the value of any uninvested cash that the fund manager maintains

for the fund.  Thus, although the shares of a mutual fund are bought and sold all day long, the

price at which the shares trade does not change during the course of the day.  Orders placed any

time up to 4:00 p.m. are priced at that day's NAV, and orders placed after 4:01 p.m. are priced at

the next day's NAV. This practice, known as "forward pricing," has been required by law since

1968.

**Late Trading**

23.    Because of forward pricing, mutual funds are susceptible to a manipulative

practice known as "late trading."  Late trading is the unlawful practice of allowing some

investors to purchase mutual fund shares **after** 4:00 p.m. at that day's NAV, even though such

after-hours trades should be priced at the next day's NAV.  Late traders seek to take advantage

of events that occur after the close of trading on any given day, while purchasing shares of

8

mutual funds at prices that do not take those events into consideration. For example, if a mutual fund invests in the stock of a particular company that announces positive results at 5:00 p.m. after the close of trading, a late trader gets to buy shares of that mutual fund at the 4:00 p.m. price, which does not reflect the favorable information. When trading opens the next day, the price of the affected company's stock will rise, causing the fund's NAV to rise. The late trader can either hold onto his mutual fund shares, acquired at yesterday's cheaper price, or sell those shares and realize an immediate profit.

24.    "Late trading can be analogized to betting today on yesterday's horse races."[2] The late trader's arbitrage profit comes dollar-for-dollar out of the mutual fund that the late trader buys. When the late trader redeems his shares and claims his profit, *the mutual fund manager has to either sell stock, or use cash on hand -- stock and cash that used to belong in the fund* -- to give the late trader his gain. The late trader's profit is revenue withheld from the mutual fund. The forward pricing rule was enacted precisely to prevent this kind of abuse. *See* 17 C.F.R. §270.22c-1(a).

### Timing

25.    Another manipulative practice used by Defendants to exploit mutual fund pricing is known as "timing," which involves short-term "in-and-out" trading of mutual fund shares. One timing scheme is "time zone arbitrage," which takes advantage of the fact that some funds use "stale" prices to calculate NAV. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A typical example is a U.S. mutual fund that invests in Japanese companies. Because of the time zone difference, the Japanese market closes at 2:00 a.m. New York time. When the NAV is calculated at 4:00 p.m. in New York, it is based upon market information that is fourteen hours old. If

---

[2]    *State of New York v. Canary Capital Partners et al.*, Supr. Ct. of N.Y., Complaint ¶ 10.

there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it opens later, the stale Japanese prices will not reflect the price change and the fund's NAV will be artificially low. Put another way, the NAV does not reflect the true current market value of the stocks held by the fund. On such a day, a trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling. By "timing" the fund, an investor seeks to earn repeated profits in a single mutual fund.

26.     Another "timing" scheme is "liquidity arbitrage." Under this scheme, a trader seeks to take advantage of stale prices in certain infrequently traded investments, such as high-yield bonds or the stock of small capitalization companies. The fact that such securities may not have traded for hours before the 4:00 p.m. closing time can render the fund's NAV stale, and thus open it to being timed.

27.     The device of "timing" is inconsistent with and inimical to the purpose for mutual funds as long-term investments. Mutual Funds are designed for buy-and-hold investors, and are therefore the preferred investment instruments for many retirement and savings accounts. Nonetheless, certain investors attempt to make quick in-and-out trades in order to exploit the inefficiency of mutual fund pricing. The effect of "timing" is to artificially increase the frequency of transactions in a mutual fund, and consequently increase the fund's transaction costs substantially above what would be incurred if only buy-and-hold investors were trading in the fund's shares. The increased transaction costs, as well as additional capital gains taxes, reduces the assets of the fund and in turn its NAV.

28.     Continued *successful* late-trading or timing requires the complicity of a funds' management.

10

29.     The Putnam Fiduciary Defendants and John Does 1-100 obtained assistance to engage in late trading directly from the PIM. In other instances, the Putnam Fiduciary Defendants did not require assistance as they, themselves, were responsible for the management and administration of the Putnam Funds, including the entry and execution of trades in Putnam Funds. *By* failing to enforce and/or follow regulations prohibiting late trading, PIM allowed and encouraged Putnam Fiduciary Defendants to buy and sell Putnam Funds, the very funds that defendants and their co-conspirators had the fiduciary duty to oversee and protect from such malfeasance, *at the 4:00 p.m. price far beyond the 4:00 p.m. deadline.* This conduct continued for a substantial amount of time and was well known within PIM and amongst the fiduciaries responsible for the management of Putnam Funds and was merely reflective of the self-dealing that pervaded Putnam Investments and PIM.

30.     Because of the harm timing can cause honest fund managers often seek to minimize the disruptive impact of timers by keeping cash on hand to pay out the timers' profits without having to sell stock. However, such efforts by honest fund managers to counter the ill effects of "timing" on their funds does not eliminate the practice, it only reduces it. Indeed, one recent study estimated that U.S. mutual funds lose $4 billion per year to timers. See Eric Zitzewitz, Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds (October 2002), http://faculty-gsb.stanford.edu/zitzewitz/Reseach/arbitrage1002.pdf. While it is virtually impossible for fund managers to identify *every timing trade*, large movements in and out of funds, like those made by the Putnam Fiduciary Defendants in the Putnam Fund are easily apparent.

31.     Fund managers generally have the power simply to reject timers' purchases. Many funds have also instituted short-term trading fees ("early redemption fees") that effectively wipe out the arbitrage that timers exploit. Typically, these fees go directly into the affected fund

11

to reimburse it for the costs of short term trading. These fees are waived if the fund managers, i.e. PIM, are assisting the timer, or as here, are the active participants in the timing scheme.

32.     In addition, fund managers are required to update NAVs at the end of the day in New York when there have been market moves that might render the NAV stale. This is called giving the fund a "fair value", and eliminates the timer's arbitrage. As fiduciaries for their funds, they are obligated to use their best efforts to employ these available tools to protect their customers from the dilution that timing causes.

## FACTUAL BACKGROUND

33.     Putnam Fiduciary Defendants and John Does 51-100 perpetrated two primary manipulative schemes on the Putnam Funds, for an undetermined time period with the complicity of the Putnam Defendants. The schemes, which had started by at least the year 1998, and were known by the Putnam defendants by the year 2000, violated the Investment Advisor's and Fund Manager's fiduciary duties to the funds but gained the Putnam Funds' managers substantial fees and other income for themselves and their affiliates, in addition to the substantial profits that were made by the Putnam Fiduciary Defendants and John Does 51-100 by engaging in the scheme. All such profits were made at the expense of Putnam Funds shareholders.

34.     PIM is the manager and investment advisor for all of the Putnam Funds. While each mutual fund is in fact its own company, as a practical matter the Advisor runs all of the funds. The portfolio managers are all typically employees of the Advisor (who hold office by election of the Trustees) not the mutual funds. The Advisor, PIM, makes its profit from fees it charges the funds for financial advice and other services. Such fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money PIM makes. In